UNITED STATES of America,
Plaintiff,

v.

180.37 ACRES OF LAND, MORE OR
LESS, Situate IN DICKENSON COUN-
TY, COMMONWEALTH OF VIRGIN-
IA, and Avin Rose, et al., Defendants.

Civ. A. No. 64–C–56–R.

United States District Court
W. D. Virginia,
Roanoke Division.

May 23, 1966.

John M. Stephens, Stephens, Combs &
Page, Pikeville, Ky., and Glyn R. Phillips,
Clintwood, Va., for Atomic Fuel Co., Inc.

Thomas B. Mason, U. S. Atty., and
James C. Roberson, Asst. U. S. Atty.,
Roanoke, Va., for the United States.

DALTON, Chief Judge.

This is an action of a civil nature
brought by the United States of America
at the request of the Secretary of the
Army for the taking of property under
power of eminent domain in connection

with the construction, operation, and maintenance of the John W. Flannagan Dam and Reservoir, Pound River, Dickenson County, Virginia, and for the ascertainment and award of just compensation to the owners and parties in interest. Although in this proceeding, several tracts and rights of different parties are involved, this opinion will deal only with the interest of the Atomic Fuel Company, Incorporated (hereinafter referred to as "Atomic") in three tracts, designated as 111–1, 111–2, and 111 E–4.

The owner of the mineral rights in the tracts here involved is the Steinman Development Company (hereinafter referred to as "Steinman"), a New Jersey corporation. By an indenture entered into on January 1, 1957 between Steinman and the Pound River Coal Company, Incorporated (hereinafter referred to as "Pound River"), the former purported to lease for a period of five years (beginning December 31, 1956), "for coal mining purposes only", 581 acres of land, a portion of which comprises the tracts in question here. The "lessee" was to have a right of renewal provided, among other things, that it constructed a plant capable of producing 300 tons of coal per day during the period of the original lease. Such a plant was never constructed, but it appears that Steinman nevertheless continued to "lease" the land to Pound River after the expiration date of the original agreement. By an instrument dated December 9, 1963, Pound River assigned the "lease" between it and Steinman to Atomic, and it is through this assignment that Atomic claims its right to compensation by reason of the government condemnation.

The tracts which the government took lie along the left ascending side of Cane Branch and along the edge of the 581 acre "leasehold," and comprise 17.26 acres of the total 581 acres in which Atomic claims an interest.

The complaint in this case was filed on June 4, 1964, together with a declaration of taking and a judgment on declaration of taking vesting title to the estate de-

fined therein in and to the properties described therein in the United States of America on June 4, 1964. The record shows that until sometime prior to this date Cane Branch was to be used as a "spillway" in connection with the operation of the Flannagan Dam. Flowage easements only were first obtained and the channel was straightened, widened, and leveled off to accommodate the overflow waters from the dam. Due to some change in the projected function and use of the dam it was determined sometime prior to June 4, 1964 that certain changes should be made, including the placing of a gate structure in the Cane Branch valley. This necessitated the present taking.

Tract 111–1 is taken in fee, and consists of 38.14 acres, some five acres of which are included in Atomic's 581 acre grant. The taking of tracts 111–2 and 111 E–4 in effect gives the government the fee for a period of two years only, after which it will merely retain a flowage easement. It is further provided that the type and location of any structures now existing or to be erected on the land must be approved by the District Engineer, U.S. Army Engineer District Huntington, or his duly authorized representative.

Federal Rule 71A(h) provides that in condemnation proceedings the court may, in its discretion, appoint a commission of three persons to determine the issue of compensation to be awarded. The commission shall have the powers of a master provided in subdivision (c) of Rule 53. Rule 53(e) (2) provides that the findings of fact by the master shall be accepted unless clearly erroneous, and Rule 71A applies this standard to the findings of the commission.

This cause was referred to three commissioners for findings as to the relative interests of the parties involved and the just compensation to be afforded each of them. By a report dated January 8, 1966, the commissioners granted Atomic only the nominal consideration of one dollar for whatever interest it possessed in

tracts 111–1, 111–2 and 111 E–4. For the reasons which follow, the court will affirm the findings of the commission.

It is a mandate of the Fifth Amendment to the Constitution of the United States that "private property [shall not] be taken for public use, without just compensation." However, before any consideration of compensation can be embarked upon, it must first be determined whether Atomic has an interest in the condemned land which the Fifth Amendment protects. It does not seem to be disputed by any of the parties here that to entitle a person having a right of occupancy of real estate to recover compensation when the land is taken, he must have an actual estate or interest in the soil. A mere contractual relation not creating such an interest is insufficient. See 2 Nichols, Eminent Domain § 5.23(7) (3rd ed. 1963).

The first line of inquiry with respect to Atomic's interest in the land in question concerns the nature of the instrument which was assigned to it by Pound River, as it is elementary that the fact that it was called a "lease" by the parties does not necessarily make it so. It is not how or what someone may characterize an instrument that determines its classification; it is the tenor, contents and substance which is the test of what the document is in law. It was the duty of the commissioners to ascertain the actual relationship which existed between Steinman and Pound River, and they came to the conclusion that the indenture of January 1, 1957 granted a mere *license* rather than a leasehold estate (in the report the instrument was sometimes referred to as "the lease," presumably for identification purposes). In reaching this decision, the commissioners did a thorough and competent job on a complex problem which required much thought and research, and this court agrees fully with their conclusion.

A lease of the tracts in question would have created an actual estate in the lessee, and in eminent domain proceedings the lessee would be entitled to compensation for the taking of his interest. 2 Nichols, Eminent Domain § 5.23(1) (3d ed. 1963). However, "[a] mining license is an incorporeal right to take ore or minerals from the land of another—a mere privilege existing contemporaneously with a like right in the grantor. It carries with it no estate or possessory interest in the land. It is only when the right to mine the minerals is not exclusive that it may be classed as an easement in the nature of a license. The licensee acquires no right to the mineral until he separates it from the freehold." 36 Am. Jur. Mines & Minerals § 63 (1941). Bostic v. Bostic, 199 Va. 348, 99 S.E.2d 591, 66 A.L.R.2d 971 (1957). See also: Annot., 66 A.L.R.2d 978 (1959); 36 Am. Jur. Mines & Minerals § 40 (1941). Since a license is generally revocable at will, the owner of such a privilege has no remedy for an invasion of his rights. It follows from this that a license as such is generally not considered compensable in eminent domain proceedings. "It has been rationalized that since the sale of the dominant estate destroys the license, the license is equally destroyed upon the vesting of title in the condemnor." 2 Nichols, Eminent Domain § 5.751 (3d ed. 1963).

Although we have found no condemnation cases on all fours with the one at bar, the Supreme Court of Appeals of Virginia, to which we must look when ascertaining the relationship of the parties, has laid down fairly definite guidelines with respect to the distinctions between a lease and a license. The case of Church v. Goshen Iron Co., 112 Va. 694, 72 S.E. 685 (1911), involved an action on a distress warrant for rent, and the question for decision was whether the relationship of landlord and tenant existed so that the action could be maintained. The critical clause in the contract provided that:

[F]irst party allows the second party to get and remove ballast rock from its limestone quarry on the following terms: The second party to furnish all machinery necessary for such quar-

rying, and to pay the first party a royalty of 10 cents a yard, of 2,500 pounds, and to remove at least 100 tons of ballast rock each and every working day that the contract is in force. 72 S.E. at 685.

The Virginia Court held that the agreement was a license, and said that a parol or written contract where the licensee does not promise or undertake anything more than to pay a royalty on the ore raised is a revocable license and not a lease. The Court quoted with approval from Bainbridge, Law of Mines & Minerals 162 (1841), wherein the author stated that, "In order to ascertain whether an instrument must be construed as a lease or a license, it is only necessary to determine whether the grantee has acquired by it any estate in the land in respect of which he might bring an action of ejectment." 72 S.E. at 686.

In the later case of Bostic v. Bostic, supra (which cited *Church* as authority), the grantor conveyed a parcel of land to his wife for life, remainder to his son. The same instrument included a reservation clause which provided:

Party of the first part hereby expressly reserves unto himself the right to mine and sell coal and other minerals underlying said tracts of land, as well as the right to cut, sell, manufacture or otherwise dispose of timbers on said premises. 99 S.E.2d at 592–593.

Here the Virginia Court held that the reservation created a mere incorporeal right, privilege, or license in the grantor. He was entitled only to mine ore and remove it, and this privilege carries with it no interest in the land. The court stressed the fact that to constitute a lease, there must be an exclusive right of possession vested in the lessee, and that the right created by such instruments was exclusive only when so agreed upon by the grantor and grantee (quoting Minor on Real Property). 99 S.E.2d at 594. See also: 36 Am.Jur. Mines & Minerals § 63 (1941).

Using the criteria delineated in these two cases, it seems evident that the instrument in question here is a license and not a lease. Here, the instrument specified that it was "for coal mining purposes *only*" (emphasis supplied) which would indicate that the only right granted by Steinman was the right to come on the land and remove coal, subject to payment of a minimum royalty. Certainly the language used here is more explicit than that employed in either *Church* or *Bostic* as indicating that only a license was being granted.

Paragraph (1) of the document under which Atomic claims provides "[t]hat this lease agreement is made for the purpose of mining and marketing the coal on said tract of land", and paragraph (2) gives the "lessee" "the right to possess and use so much of the leased premises as may be reasonably necessary for mining, transporting and marketing the coal." It seems obvious that Atomic did not have such an estate as would enable it to bring an action of ejectment. Neither of these provisions gives Atomic an exclusive right of possession.

By paragraph (15), "All rentals, royalties, and other monies which may at any time become due from the Lessee to the Lessor hereunder shall be treated as rents reserved for the use of the leased premises, and the Lessor shall have in relation thereto all the rights and remedies of a landlord for the recovery of rents under the laws of the State of Virginia." Steinman, then, *could* maintain an action of distress, but this right was created by the parties through contractual action. If it had been a true lease agreement, the lessor would have this right by operation of law and such a provision in the contract would be unnecessary.

There is much authority for the proposition that a license, as a personal right, cannot be assigned, 36 Am.Jur. Mines & Minerals § 63 (1941), and under this theory the assignment from Pound River to Atomic would be a nullity. However, even assuming, *arguendo*, that the assignment was good to transfer all of Pound River's interest in the tract to Atomic, the interest remained contractural rather

than an estate in the land itself, and so no compensation is due Atomic as a result of the exercise of the government's eminent domain power.

In some jurisdictions a distinction has been drawn between a "mere license" and a license "coupled with an interest." An example of the latter variety would presumably be a situation such as the one at bar, where the grantee has the right to go on to the land and actually *remove* something *a profit a prendre*. Speaking of such decisions Mr. Nichols has said, "Profits *a prendre*, or the right to take something from a piece of land, are property in the constitutional sense, and the owner of the right is entitled to compensation if the land upon which it is exercised is taken for public use; * * *." 2 Nichols, Eminent Domain § 5.72(7) (3d ed. 1963). However, in Virginia "license" and *"a profit a prendre"* seem to be used interchangeably, the latter occupying no higher position than the former. See Bostic v. Bostic, supra, 99 S.E.2d at 594 where the Court quotes from Minor on Real Property and Graves on Real Property.

There remains before the court one additional consideration. The evidence indicates that Atomic made excavations for two pits fifty feet by sixty feet wide in preparing for the foundations for its tipple, and removed from these excavations approximately 1200 to 1500 tons of coal. This coal was apparently severed from the freehold (at which time title passed to Atomic) before June 4, 1964, and was piled on the land when the government took possession. After the declaration of taking the government had full control of the land and Atomic thereafter did nothing toward removing the coal.

■ The general statute relating to federal condemnation for flood control projects is 33 U.S.C. § 701c–2, which incorporates the provisions of 33 U.S.C. §§ 593–595. The latter sections give the government the power to condemn any "lands, easements or rights of way" needed for a particular project. Although as a general proposition personalty may be condemned, this provision does not seem to give the government that power when it is taking land for flood control purposes. However, if such a right had been granted by sections 593–595, the fact remains that the declaration of taking in this case mentioned only realty. Consequently, this Court in this proceeding cannot undertake the consideration of Atomic's claim for the mined coal. That, if pursued, must be done in some other action.

Particular remedies for damage by reason of wrongful or unlawful taking are included as a part of some condemnation statutes, but the court has found no such provision in the acts applicable to the instant case.

The case of Grand River Dam Authority v. United States, Ct.Cl., 175 F.Supp. 153 (1959), cited by counsel for Atomic, has a different factual situation as to ownership. Moreover, the controlling law of the State of Virginia definitely holds that the licensee has no estate in the land.

It is the judgment of this court that the instrument which was assigned to Atomic Fuel Company, Incorporated by Pound River Coal Company, Incorporated was a mere license creating no estate in the land which would be protected by the Fifth Amendment in condemnation proceedings. As a technical matter, the court will strike out the one dollar awarded by the commissioners, since Atomic does not even have a nominally compensable interest in the tracts involved.

An order will be entered to this effect.